OPINION OF THE COURT
Kaye, J.
In an appeal involving established sex discrimination, the issue before us centers on the measurement of damages for complainant’s mental anguish. We conclude that the Appellate Division erred in reducing the damages found by the State Division of Human Rights, and therefore reverse the order and remit the matter to that court for further proceedings in accordance with this opinion.
I.
The following findings were made by the Administrative Law Judge, adopted by the State Commissioner of Human Rights, confirmed by the Appellate Division, and supported by sufficient evidence. The hearing Judge stated that, in his 20-year experience as an Administrative Law Judge with the Human Rights Division, this was "the most shocking instance of abuse of an employee by an employer.” The Commissioner explicitly endorsed that observation, and the Appellate Division as well characterized the Transit Authority’s conduct as "blatant discrimination against [the complainant] solely because of her pregnancy.” (163 AD2d 315, 316.)
Complainant, since August 1978 a bus driver for the New York City Transit Authority, was transferred to Staten Island in September 1980, and during 1981 and 1982 was the only female Transit Authority bus driver there. Four separate episodes of unlawful discriminatory conduct took place be *211 tween June 1981 and August 1982, relating to her job status before, during and after pregnancy.
The June-July 1981 Discrimination. Having had prior miscarriages and a prolonged fertility problem, complainant, on learning that she was pregnant, in June 1981 sought restricted duty — meaning work other than driving a bus. Male bus drivers with temporary disabilities were routinely granted restricted duty.
Complainant asked the Transit Authority medical office to recommend restricted duty, supporting that request with a letter from her personal physician advising her to restrict physical activity and avoid sudden jolting or jarring, prolonged standing, and excessive lifting or bending. Having been told by the union president that such a job had already been selected for complainant, on June 16, 1981, the Transit Authority doctor — Jacob Oberman — on Transit Authority form (G-46) classified her as "Restricted [Duty],” "Not to operate in road service, no excessive bending or lifting,” and he directed reexamination "post-partum.” He also wrote a memorandum to the clinic, noting that complainant previously had a spontaneous abortion and was therefore not being returned to full duty.
After one week of restricted duty — performing the same work as a male bus driver on restricted duty, and with no further examination by the Transit Authority — complainant was abruptly returned to road service, pursuant to the decision of the Transit Authority medical office. On a G-46 prepared on or about June 23 but dated June 16, Dr. Oberman indicated that he had examined complainant, and that he found her qualified for full duty, describing her disability as "Cramps-Nausea” instead of "Pregnancy,” as on the first June 16 form. The Transit Authority offered no explanation for what the Administrative Law Judge called its "contradictory acts.”
Faced with the choice of driving a bus or not working, complainant determined that she could not afford to be without a paycheck for seven months and had to resume full-duty status. She did, however, secure a second letter from her doctor, stating: "The above-named patient has had [a] prolonged fertility problem of six years. She is now pregnant, with on and off cramps and spotting, and is constantly in fear of losing her expected child. Driving a bus would definitely expose her to the possibility of a miscarriage. * * * Should the *212 patient then abort, and a legal factor arises, who would be responsible?” Complainant tried to present this letter to Dr. Oberman, but his secretary — who carried the letter into his office — told her that the doctor could not see her without an appointment.
On June 29, complainant filed a verified complaint with the Division charging that the Transit Authority had discriminated against her because of her sex, by refusing to place her on restricted duty during the period of her temporary disability due to pregnancy, though such assignments were granted to male employees with temporary disabilities.
The July-September 1981 Discrimination. On July 16, while on full-duty status, complainant had a miscarriage, and was then placed on leave without pay. When she appeared for a prereinstatement examination on September 1, 1981 — prepared for full duty, and so found by a Transit Authority doctor — a second Transit Authority doctor (Dr. Louis Lanzetta) put her on restricted duty until psychiatric evaluation. Complainant’s own doctor’s letter stated that she could return to work and perform her duties as a bus driver.
The Transit Authority psychiatrist reported that, while she "loves her job talking to people,” complainant "presented many controversial issues as to her duty status. She harbors the thought that 'they are trying to get me off the job because I am a woman.’ ” The psychiatrist found her to be very tense and anxious, "shaky and very preoccupied about her nervous feelings.” "Opinion: Anxiety state in a situational problem and job dissatisfaction. Recommendation: Restricted duty temporarily. Re-examination if deemed necessary.”
Dr. Lanzetta then marked complainant permanently for restricted duty, and when she objected — insisting she was fully capable of driving a bus — he responded that she might get pregnant again. Complainant continued to object to restricted duty status. On September 8, Dr. Lanzetta restored her to full duty, but only on her promise that she would stop working immediately if she became pregnant.
In December 1981, complainant amended her complaint to include additional charges of discrimination during this period.
The January-August 1982 Discrimination. Complainant worked as a full-duty bus driver from September 8, 1981 to January 13, 1982. On January 13, 1982, after learning that she was pregnant, complainant requested restricted duty, *213 supporting her request with a letter from her personal physician. This time, however, Dr. Oberman, told her that he would "go further than” her doctor: he classified her "no work,” directing reexamination after delivery. He said he was taking this step because of the previous miscarriage, her "stress,” and her "anxiety state.”
When complainant objected, Dr. Oberman said he didn’t care. To her statement that this was retaliation for his earlier change of her status, Dr. Oberman responded, "Yeah, well, I’m not going to do it again; there is no work.” When complainant noted that she was being denied work — and pay — he said "that’s not my problem.” As the Administrative Law Judge found, "The record is silent as to any legitimate basis for this seemingly excessively hostile and negative treatment of the Complainant and her wishes nor anything to point [to] the unsuitability of a restricted duty assignment for her.” Complainant’s subsequent efforts to change her no-work to restricted-duty status were unavailing, one superior explaining to her that under rule 162 (c) of the "Rules and Regulations Relative to Working Conditions of Employees,” her options were to drive a bus or go on unpaid maternity leave. Complainant remained in no-work status, without compensation or sequential employment privileges, until the birth of her child on August 21, 1982 although, as found, she could have worked in restricted-duty status through August 8.
On February 3, 1982, complainant filed a second verified complaint with the Division alleging discrimination and retaliation by the Transit Authority in January 1982 by forcing her to go on leave when she sought restricted duty.
The September 1981 Psychiatric Examination. The fourth separate act of discrimination found was the reference for psychiatric examination when complainant returned to work in September 1981. Complainant charged that this was retaliation for the charges she had filed with the Division and for opposing the Transit Authority’s unlawful practice in treating pregnant employees differently from male employees with temporary disabilities. The need for psychiatric examination, reflected on her employment record, would — complainant charged — lead to continuing questions about her sanity, especially her fitness to drive a city bus.
Damages Awarded for the Discriminatory Acts
While the various tribunals agreed unanimously that the *214 Transit Authority’s acts constituted unlawful discrimination causing complainant mental anguish, they differed as to appropriate compensation for that injury.
Apart from back pay (not in issue here), the Administrative Law Judge found that the complainant was entitled to $450,000 in damages for mental anguish and aggravation: $250,000 for the Transit Authority’s June-July 1981 discrimination, $50,000 for the July-September 1981 discrimination, $100,000 for January-September 1982 discrimination, and $50,000 for the discriminatory conduct in September 1981. He premised his findings on the complainant’s testimony "at length and in convincing detail” that the Transit Authority’s acts — done intentionally to hurt her — caused her anguish, self-guilt, depression and anger at the time each occurred and that the mental distress persisted, even to the time of her testimony before him in late 1987 and early 1988.
In adopting the Proposed Order of the Administrative Law Judge, the Commissioner noted that complainant would have to live with the thought that her fetus was destroyed because her employer would not grant what the law required, and— while the record did not establish with sufficient certainty that the Transit Authority’s conduct caused her miscarriage— "its conduct brought her callously and wantonly to a decision, to continue working as a bus driver, the consequences of which caused and most likely will continue to cause her feelings of guilt, feelings of resentment and other mental anguish about her lost child, to the end of her days.” The administrative relief included a cease and desist order, back pay and compensatory damages of $450,000 for mental anguish and aggravation.
While agreeing that compensatory damages were appropriate for complainant’s mental anguish, and that such an award might be based solely on her testimony, the Appellate Division concluded that the award of $450,000 was not justified here. Relying on its own recent decision in Matter of Cosmos Forms v State Div. of Human Rights (150 AD2d 442), the court held that complainant had "failed to adduce facts concerning the duration of her condition, its consequences, or any evidence concerning any treatment” (163 AD2d, at 316), and it recommended that a new award not to exceed $75,000 be made on remittitur. We granted leave, and now reverse.[1]
*215 II.
Unlawful discriminatory conduct may be redressed by court action, or by administrative action pursuant to the procedures set out in the Human Rights Law (Executive Law art 15; see especially, Executive Law § 297). That statute empowers the Commissioner of Human Rights to order relief "as in the judgment of the division will effectuate the purposes of this article,” including an award of compensatory damages to the person aggrieved (Executive Law § 297 [4] [c] [iii]). In any subsequent judicial review of the Commissioner’s order, the "findings of facts on which such order is based shall be conclusive if supported by sufficient evidence on the record considered as a whole.” (Executive Law § 298.) The statute, however, does not specify any particular standard for judicial review of the relief awarded by the Commissioner.
This appeal focuses on the standard of review for the Commissioner’s award of compensatory damages for mental anguish and aggravation.
Throughout tort law, psychic injury — by nature essentially subjective — has prompted difficult questions of proof, both as to establishing the genuineness of any injury and as to fixing its dollars-and-cents valuation (see, e.g., Ferrara v Galluchio, 5 NY2d 16, 21-22; 2 NY PJI 617; Prosser and Keeton, Torts § 12 [5th ed]). Such questions have particular pertinence to Human Rights Law cases, where mental suffering is not only compensable (see, State Commn. for Human Rights v Speer, 29 NY2d 555, revg on dissent 35 AD2d 107, 112 [Hopkins, J.]), but also a frequent — sometimes sole — consequence of unlawful discriminatory conduct.
Several competing considerations must be taken into account in the review of mental anguish claims prosecuted before the Division.
Favoring deference to the assessments of the Commissioner are the important objectives of the Human Rights Law, the discretion vested in the agency to achieve those objectives, and *216 its four decades of special experience in weighing the merit and value of such claims. On the other hand, the Legislature has stipulated that the agency may award only compensatory —not exemplary — damages (see, by contrast, Labor Law § 198 [1-a]; Workers’ Compensation Law § 14-a [1]) and it has provided for judicial review. If judicial review is to be more than a rubber stamp of agency orders, obviously there must be sufficient proof of mental anguish caused by the discrimination, as well as the extent of injuries being compensated.
Reflecting a balance of those considerations, in Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of Human Rights (35 NY2d 143), we sustained the Commissioner’s award of damages for mental anguish, noting that the extremely strong statutory policy of eliminating discrimination gives the Commissioner greater discretion in effecting an appropriate remedy than under strict common-law principles. While the objective of the common-law right is to provide private remedies, in Human Rights Law cases the right is statutory and involves a vindication of both the individual’s interests and those of society. ”[D]ue to the strong anti-discrimination policy spelled out by the Legislature of this State * * * aggrieved individuals] need not produce the quantum and quality of evidence to prove compensatory damages [they] would have had to produce under an analogous provision, and this is particularly so where, as here, the discriminatory act is intentionally committed.” (Id., at 147.)
The existence of compensable mental injury may be proved, for example, by medical testimony where that is available, but psychiatric or other medical treatment is not a precondition to recovery. Mental injury may be proved by the complainant’s own testimony, corroborated by reference to the circumstances of the alleged misconduct. In Batavia itself, sufficient evidence was found in the circumstances of a social event, where blacks were insulted and denied service, and in complainants’ own description of the symptoms they experienced as a result of that discriminatory conduct (see also, Matter of Cullen v Nassau County Civ. Serv. Commn., 53 NY2d 492, 497). The Commissioner’s factual findings as to the existence of mental anguish as a consequence of unlawful discrimination, when supported by sufficient evidence on the record considered as a whole, are of course binding on the reviewing court (Executive Law § 298; 300 Gramatan Ave. Assocs. v State Div. of Human Rights, 45 NY2d 176, 179).
*217 Beyond the fact of mental anguish caused by discriminatory conduct, there must be some evidence of the magnitude of the injury, to assure that the Commissioner’s damage award is neither punitive nor arbitrary.
From this Court’s earliest consideration of the antidiscrimination statute (Matter of Holland v Edwards, 307 NY 38) to our most recent (Matter of Consolidated Edison Co. v New York State Div. of Human Rights, 77 NY2d 411), we have recognized that the relief imposed by the Commissioner need only be reasonably related to the discriminatory conduct. "Unless the award is so arbitrary and capricious as to constitute an abuse of discretion, it is not erroneous as a matter of law (Matter of Imperial Diner v State Human Rights Appeal Bd., 52 NY2d 72, 79, supra; Matter of Mize v State Div. of Human Rights, 33 NY2d 53, 55, supra; Matter of Holland v Edwards, 307 NY 38, 46, supra).” (Matter of Consolidated Edison Co. v New York State Div. of Human Rights, 77 NY2d, at 420, supra.)
In Consolidated Edison, we affirmed the Commissioner’s award of $10,000 for the complainant’s hurt, humiliation and mental anguish caused by discriminatory hiring and promotion practices, concluding that it was "supported by the evidence and * * * within the range of awards previously approved by this and other courts (see, e.g., Matter of Lutheran Social Servs. v State Div. of Human Rights, 142 AD2d 950, affd 74 NY2d 824 [$25,000]; Matter of New York State Dept. of Correctional Servs. v McCall, 109 AD2d 953 [$10,000]).” (77 NY2d, at 421, supra.)
In reducing the Commissioner’s award from $450,000 to a maximum of $75,000, the Appellate Division misapplied the governing principles.
As is evident from the holding and the writing, the Appellate Division accorded no deference to the Commissioner’s assessment of the magnitude of complainant’s injuries, but without elaboration simply substituted its own view that a maximum of $75,000 would adequately compensate complainant for her mental anguish and aggravation. It did so without first determining whether there was evidence to support the Commissioner’s award of damages. Moreover, despite citation to other cases, the Appellate Division memorandum in no way indicates how this award for four separate injuries compares— qualitatively and quantitatively — with those cases, which are for the most part immediately distinguishable as single inci *218 dents of discrimination with scant proof of actual injury, in which the Appellate Division has either affirmed an award under $5,000 or reduced one to that range. Nothing in the law fixes a nominal amount up to $5,000 as appropriate compensation for mental anguish caused by unlawful discrimination.
To the extent the Appellate Division reviewed the evidence, drawing a parallel to its own recent decision in Matter of Cosmos Forms (150 AD2d 442, supra), its conclusions are incorrect. In Cosmos, the only evidence of mental anguish was the complainant’s own testimony that she was emotionally and physically "screwed up.” (Id.) While it is certainly appropriate for the Appellate Division — in its unique role of reviewing a compensatory damage award for excessiveness — to apply objective criteria such as the duration of a complainant’s condition, its severity or consequences, any physical manifestations, and any medical treatment, this case is not Cosmos.[2]
Here, there were extensive findings by the Administrative Law Judge, confirmed by the Commissioner, of four separate episodes of discriminatory conduct by the Transit Authority, and mental anguish and aggravation associated with each, supported by complainant’s testimony, her doctor’s testimony, the Transit Authority’s own medical findings, and the evaluation that, compared to the other Division proceedings, the level of abuse here was "shocking.” For example, in the June-July 1981 period — for which the sum of $250,000 was assessed —there are findings that the Transit Authority’s refusal to allow restricted duty compelled complainant’s decision to continue driving a bus, the consequence of which caused and likely will continue to cause her feelings of guilt, resentment and other anguish over her lost child. The Appellate Division statement that complainant’s feelings of depression after suffering the miscarriage "were not unequivocally attributable to NYCTA” (163 AD2d, at 316) is a mischaracterization of the Commissioner’s finding that, while there was insufficient proof the Transit Authority’s wrongdoing caused the miscarriage, there was a sufficient link between the Transit Authority’s conduct and complainant’s mental anguish after the miscarriage, persisting to the time of her testimony.
Without further recapitulating the record, it is sufficient to *219 note that the Appellate Division, in exercising its authority to review the Commissioner’s award for legal error and excessiveness, did not do what the law required it to do: determine whether the relief was reasonably related to the wrongdoing, whether the award was supported by evidence before the Commissioner, and how it compared with other awards for similar injuries. We therefore remit the matter to that court for review under the proper standard.
Finally, the agency and amici contend that the Commissioner’s awards are arbitrarily cut to nominal amounts, thus trivializing the genuine mental suffering caused by discrimination. There is surely merit in the point that a reviewing court’s mere substitution of a round number, without setting forth any rationale for reaching that number, would be cause for concern. But it also bears note that the same concern may arise when the Division itself does not spell out any rationale for the dollar amount of its monetary awards. In that the concept of compensation, and the fact of judicial review, are part of the process of adjudicating discrimination claims before the Division, some indication of the agency rationale for assigning a particular dollar value to a claim of mental anguish might, for the future, benefit the parties as well as the process, helping to assure that a complainant’s injuries are fairly compensated.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the matter remitted to the Appellate Division, Second Department, for further proceedings in accordance with the opinion herein.
Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order reversed, etc.

. The Transit Authority erroneously asserts that this Court is without *215 jurisdiction to hear the appeal because the order is nonfinal. Plainly, however, this appeal lies pursuant to CPLR 5602 (a) (2) (see, Executive Law § 298; Matter of Zeronda, Inc. v Town Bd., 37 NY2d 198, 200-201; see also, Matter of Power Auth. v Williams, 60 NY2d 315, 323-324). Nor is the core issue one of fact beyond our review, as further argued by the Transit Authority. The issue before us is not the excessiveness or inadequacy of damages but whether the Appellate Division applied the proper standards in reviewing the Commissioner’s order.

. In that the Commissioner’s damages award is compensatory, the "shocks the conscience” standard of Matter of Pell v Board of Educ. (34 NY2d 222) for review of agency sanctions would be inapplicable (see, Matter of Unitel Video v State Div. of Human Rights, 147 AD2d 377).